CAROL M. THOMPSON v. DONALD O. THOMPSON; L & O, INC., a CORPORA-
TION; AND ROBERT B. PRYOR, TRUSTEE AND STEPP, GROCE, PINALES &
COSGROVE, a PARTNERSHIP v. CAROL M. THOMPSON

No. 8329DC578

(Filed 4 September 1984)

1. **Attorneys at Law § 7.1; Contracts § 6— domestic relations case—contingent
fee agreement—void as against public policy**

A contract for the payment of a fee to an attorney contingent upon the
securing of a separation or divorce or contingent in amount upon the amount
of alimony, support or property settlement obtained is void as against public
policy.

2. **Attorneys at Law § 7.1; Quasi Contracts and Restitution § 1.2— void con-
tingent fee contract—recovery in quantum meruit**

Although a contingent fee contract in a domestic relations case was void
as against public policy, plaintiff attorneys were entitled to recover in *quan-
tum meruit* for the reasonable value of their services as of the date they were
discharged by defendant client. However, the reasonable value of those serv-
ices must be determined without consideration of the amount plaintiffs would
have received under the contingent fee contract.

Judge HEDRICK dissenting.

APPEAL by defendant from *Gash, Judge*. Judgment entered 4
January 1983 in District Court, HENDERSON County. Heard in the
Court of Appeals 5 April 1984.

This appeal involves a contingent fee contract entered into
by the defendant, Carol M. Thompson and the intervenor-plaintiff
law firm, Stepp, Groce, Pinales & Cosgrove in connection with a
contemplated domestic relations action against plaintiff's then-
husband, Donald O. Thompson. The intervenor law firm agreed to
represent Mrs. Thompson in early January, 1981. The contingent
fee contract at issue was executed on 27 January 1981. Shortly
thereafter, Mrs. Thompson discharged the intervenor law firm
and secured other counsel to pursue her domestic case.

The underlying domestic action was then instituted on 27
February 1981 by Carol Thompson against Donald Thompson and
L & O, Inc., a family business, seeking alimony, alimony *pendente
lite*, and the setting aside of certain purportedly fraudulent con-
veyances and stock transfers involving the family business and
properties. On 12 March 1981, the law firm of Stepp, Groce,

Pinales & Cosgrove filed a motion to intervene in the action between Mrs. Thompson and her husband. In their motion, the intervenors alleged that they were the discharged attorneys of the plaintiff, Mrs. Thompson, and that they had a one-fourth contingent fee contract with her which gave them a proprietary interest in the subject matter of Mrs. Thompson's suit against her husband, and further, that they were entitled to a percentage of that recovery.

The motion was resisted by Mrs. Thompson; however, the District Court judge allowed the law firm to intervene "in its discretion under the permissive right to intervene provisions of Rule 24 of the Rules of Civil Procedure." Accordingly, the intervenor-plaintiffs served on Carol Thompson a complaint, filed 13 March 1981, which alleged, *inter alia,* that an offer to settle the Thompson case was made to Mrs. Thompson by Mr. Thompson's attorney, Mr. Boyd Massagee, Jr., by letter on 9 February 1981 and that based upon their contingent fee contract, intervenors were entitled, as discharged attorneys, to one-fourth of the value of this offer.

Thereafter, the domestic case proceeded between the Thompsons and the case in intervention proceeded between Mrs. Thompson and her former attorneys. The Thompsons eventually settled their domestic case by two court orders. Discovery was had in the suit in intervention and both sides filed motions for summary judgment, which were denied by the trial court.

On 27 October 1981, plaintiff filed a motion to amend her answer to allege certain affirmative defenses and to request a jury trial. Plaintiff's motion was denied in its entirety, as was her additional motion to compel discovery relative to the question of the reasonable value of the services rendered by intervenors.

When the case was called for trial as a non-jury matter on 19 October 1982, the defendant made an oral motion to dismiss the intervenors' action. The motion was denied and evidence was received by the court. Defendant's motions for involuntary dismissal at the close of the intervenor's evidence and at the close of all the evidence were both denied. From a judgment entered in favor of the intervenor law firm in the amount of $47,500, defendant appeals.

*Lentz, Ball & Kelley, P.A., by Ervin L. Ball, Jr., for defendant appellant.*

*Stepp, Groce, Pinales & Cosgrove, by Edwin R. Groce and W. Harley Stepp, Jr., for intervenor appellees.*

JOHNSON, Judge.

The central question presented by this appeal is whether the contingent fee contract sued upon by the intervenor law firm in this domestic action between a wife and husband is enforceable. For the reasons set forth below, we hold that a contract for the payment of a fee to an attorney contingent upon the securing of a separation or divorce or contingent in amount upon the amount of alimony, support or property settlement obtained is void as against public policy.

I

The evidence offered at trial may be summarized as follows: Mr. and Mrs. Thompson were married in 1953 and up to the time of their divorce in March, 1982 were involved in the business of construction and land development. The couple did business through a corporation known as L & O, Inc., named as a party defendant in the original suit, in which Mrs. Thompson had a 49% ownership interest and Mr. Thompson a 51% ownership interest. Mr. and Mrs. Thompson also owned equal interests in a partnership known as Haywood Knolls. The Thompsons were very successful in their various enterprises. Haywood Knolls consisted primarily of land held for development purposes and was valued at approximately 1.5 million dollars, with an indebtedness of approximately one-half million dollars at all relevant times. The couple's total equity in all of their properties was substantially in excess of two million dollars in December of 1980, the month that Mr. Thompson left his wife.

In December, 1980, Mrs. Thompson purportedly conveyed certain real property to Mr. Thompson and to certain trusts after being told by him that the conveyances were for estate planning and tax reasons. Mr. Thompson also either caused Mrs. Thompson to sign a number of deeds in blank, or forged her name to such deeds, purportedly conveying some of their real estate holdings to himself. Later that month, while Mrs. Thompson was vacation-

ing in Florida, Mr. Thompson, among other things, withdrew approximately $500,000 in cash from various joint bank accounts, and put the money into his individually-owned accounts. Upon Mrs. Thompson's return from Florida, she found that Mr. Thompson had removed himself from the marital home; he also announced that he was no longer going to live with her. In early 1981, Mrs. Thompson discovered her husband's financial manipulations. It is against this background that Mrs. Thompson sought an attorney with the law firm of Stepp, Groce, Pinales & Cosgrove.

Mrs. Thompson met with Mr. Stepp of the intervenor law firm for the first time on 5 January 1981. Soon thereafter, Mrs. Thompson prepared statements, at Mr. Stepp's request, showing the financial worth of herself and her husband. In addition, she provided copies of all the pertinent real estate documents her husband had recorded at the Henderson County Courthouse, tax listing sheets and other information. Three or four meetings were held during the next three weeks between Mr. Stepp and Mrs. Thompson regarding the suit.

Mr. Stepp testified that he discussed the matter of fees with Mrs. Thompson during their first meeting. According to Stepp, he gave Mrs. Thompson a choice between a flat fee and a contingent fee arrangement and advised her to think about it further. Mrs. Thompson, to the contrary, testified that the first time a fee was discussed between Mrs. Thompson and Mr. Stepp was on 26 January 1981, and at that time she was given a choice between an hourly rate or a one-fourth fee contingent upon the amount secured by settlement or other judicial disposition of the case; she chose the latter. A written fee contract was executed on 27 January 1981.

Mr. Thompson was then represented by Mr. Boyd B. Massagee, Jr., an attorney practicing in Henderson County. Mr. Massagee testified that immediately after receiving Mr. Stepp's first letter of 9 January 1981, the two attorneys began discussing a settlement of the Thompson case. A number of proposals were made and the same day that the fee contract was executed, 27 January 1981, Mr. Massagee received a detailed letter from Mr. Stepp containing an offer to settle the Thompson case. Mr. Stepp received a reply from Mr. Massagee on or about 9 February 1981. Mr. Stepp and Mrs. Thompson were in touch by telephone from 27 January to 9 February 1981.

Mrs. Thompson went to Mr. Stepp's office on or about 9 February 1981 to discuss the settlement proposed by Mr. Massagee. Mrs. Thompson testified that she did not state that she would agree to the proposal but that she wanted to think about it, and further, that Mr. Stepp and his law partner, Mr. Edwin A. Groce, advised her that they believed this was the best settlement she could get out of court.

On direct examination, Mr. Stepp testified that Mrs. Thompson told him in unequivocal terms that the offer was acceptable to her. However, on cross-examination Stepp admitted that Mrs. Thompson did not sign any document indicating her acceptance of the Massagee proposal and characterized the proposal in the following terms:

I considered what we had from Mr. Massagee as a basic ground level proposition for us to start to elaborate on. It was the framework from which we could work around to a final solution for her.

Mr. Stepp also testified that he urged Mrs. Thompson to fully evaluate the proposal to determine whether it adequately protected her interests.

The amount offered in the Massagee proposal was somewhat more than one million dollars. Mrs. Thompson discussed the offer with various friends and a relative, one of whom suggested that if she was not satisfied with the offer, she should hire another attorney and discharge Stepp. That individual recommended Mr. Robert Whitmire of the Henderson County Bar. Thereafter, Mrs. Thompson discharged Mr. Stepp, collected her file, and hired Mr. Whitmire to represent her.

Mr. Stepp testified that his office kept no records of the time spent on the Thompson file, of telephone calls or of conferences. Mr. Stepp could not estimate the total time spent during his firm's thirty-day representation of Mrs. Thompson, although he guessed that it could be as high as 200 hours. Both Stepp and Massagee believed the Thompson case to be both complicated and complex, presenting questions involving the law of partnership, trusts, fraud, alimony, child custody, support, joint bank accounts and the confidential relationship between husband and wife.

Mrs. Thompson testified that she discharged Mr. Stepp because she felt that he was pressuring her to accept her husband's offer of 9 February 1981. Mrs. Thompson was dissatisfied with the terms of the offer. Mr. Whitmire, who began representing Mrs. Thompson on or about 16 February 1981, instituted a lawsuit for her on 27 February 1981 against Mr. Thompson and the parties' corporation, L & O, Inc. The Thompson case was subsequently litigated and culminated in a final settlement on 9 September 1981. Mrs. Thompson ultimately paid her attorney, Robert Whitmire, $37,500 for the services he rendered in the domestic action.

The trial court's findings of fact are generally reflective of the foregoing summary; the controverted issues of fact as to the time when fees were first discussed and whether the 9 February 1981 offer was accepted by defendant, however, were resolved against defendant and in favor of the plaintiff law firm. In essence, the trial court found and concluded that the law firm of Stepp, Groce, Pinales & Cosgrove did a considerable amount of work in a complex case on behalf of Mrs. Thompson during the period from 5 January 1981 to 16 February 1981, culminating in the 9 February 1981 offer of some one million dollars in settlement of the Thompson lawsuit, which offer was "substantially accepted" by Mrs. Thompson prior to her decision to discharge the plaintiff law firm. The court further found and concluded that the fee contract executed by the parties, providing for a contingent fee of one-fourth of any amount recovered by compromise settlement, is fair and reasonable in all respects, including the consideration that Mrs. Thompson "had very little money, if any, to pay an attorney upon a flat fee basis at the time she employed said plaintiff law firm;" that the amount of the fee that said attorneys would be entitled to under that contract is $250,000; and that using the relevant hourly basis as a guide, a reasonable fee would be at least $20,000, considering the amount of time involved and the standing of the lawyer. Finally, the court concluded as a matter of law that, taking all the relevant considerations into account, the plaintiff law firm was entitled to $85,000 as a reasonable attorney fee, less credit for the $37,500 paid to Mr. Robert L. Whitmire, Jr., the attorney subsequently hired by Mrs. Thompson.

## II

Defendant primarily challenges the judgment rendered by the trial court on the contingent fee contract by assigning error to the court's order allowing the plaintiff law firm to intervene in her domestic action against her former husband, Donald Thompson. Defendant argues that the order allowing intervention was improper for the following reasons: (a) the fee contract was void as against public policy and therefore unenforceable; (b) the contract sued upon, including the claimed fee, violates the Code of Professional Responsibility and is void; (c) no cause of action was stated in the complaint in intervention; (d) intervention was improper under Rule 24 of the Rules of Civil Procedure; and (e) no cause of action had arisen on the date of intervention, 2 April 1981, as the underlying domestic action was not finally settled until 8 September 1981, when the defendant wife recovered from her former husband. Although we have some reservations as to whether intervention was properly allowed in this case as a purely procedural matter,[1] we need not address each of the defendant's separate arguments as we base our decision in this appeal on the ground that the contract which formed the basis of the intervenor's claim is void as contrary to public policy and therefore unenforceable.

## A

[1] In other areas of the law, contingent fee contracts are upheld when they are entered into in good faith, without suppression or reserve of fact or apprehended difficulties, without undue influence, and for reasonable compensation. *Casket Co. v. Wheeler,*

---

1. Although the plaintiff moved to invervene in the underlying divorce action as a matter of right under G.S. 1A-1, Rule 24(a)(2), the order allowing intervention states that intervention would be allowed in the court's "discretion under the *permissive right* to intervene . . ." Rule 24(b)(2) allows non-statutory permissive intervention by anyone "When an applicant's claim or defense and the main action have a question of law or fact in common." It is evident that no common question of law or fact existed between the Thompson domestic matter and the discharged intervenor-law firm's action for fees under their contingency fee contract with Mrs. Thompson. Consequently, under express terms of Rule 24(b)(2), it would appear that the trial court had abused its discretion by allowing the law firm's motion to intervene. *But see Casket Co. v. Wheeler,* 182 N.C. 459, 109 S.E. 378 (1921) (under pre-Rules practice, law firm could properly intervene in client's underlying action to enforce contingency fee contract where necessary to prevent defendant from disposing of funds).

182 N.C. 459, 109 S.E. 378 (1921) (action by corporation to recover on account of unpaid subscription to capital stock from former corporate secretary and treasurer); *Covington v. Rhodes*, 38 N.C. App. 61, 247 S.E. 2d 305 (1978), *disc. review denied*, 296 N.C. 410, 251 S.E. 2d 468 (1979) (personal injury action). Such contracts are primarily for the benefit of indigents or those not capable of employing an attorney to protect their rights. *Casket Co. v. Wheeler, supra; Covington v. Rhodes, supra.* The question of the validity of a contingent fee contract in a domestic case is one of first impression in this jurisdiction. However, the longstanding and prevailing view in other jurisdictions is that a fee contract contingent on the securing of a divorce, or contingent in amount on the amount of alimony, support, or property settlement to be obtained, is against public policy and void. 7 Am. Jur. 2d, Attorneys at Law, § 257 (1980); Anno., 30 A.L.R. 188 (1924); *See, e.g. Sobieski v. Maresco*, 143 So. 2d 62 (Fla. App. 1962); *Keller v. Turner*, 153 Mont. 59, 453 P. 2d 781 (1969); *Aucoin v. Williams*, 295 So. 2d 868 (La. App.), *cert. denied*, 299 So. 2d 798 (La. 1974); *McDearmon v. Gordon & Gremillion*, 247 Ark. 318, 445 S.W. 2d 488 (1969); *Osborne v. Osborne*, 384 Mass. 591, 428 N.E. 2d 810 (1981); *Levine v. Levine*, 206 Misc. 884, 135 N.Y.S. 2d 304 (1954).

A thorough and convincing explanation of the universal view that contingent fee contracts in domestic actions are contrary to public policy is contained in the opinion of the Appellate Court of Indiana in *Barelli v. Levin*, 144 Ind. App. 576, 247 N.E. 2d 847 (1969). In that case, the court held that a contingent fee contract to pay an attorney a percentage of "whatever may be recovered" in a divorce action was contrary to public policy and void. The court reviewed the early history of contingent fee contracts and noted that some types of contingent fee contracts were considered champertous at early common law on the grounds that such contracts tend to promote litigation and to multiply lawsuits. *Id.* at 583, 247 N.E. 2d at 850. Nevertheless, recognizing that these contracts were often necessary to provide a means of procuring legal redress to persons who have rights, but not to the financial means to pursue them, modern courts have upheld contingent fee contracts under certain circumstances. *Id.* at 585-86, 247 N.E. 2d at 851.

The court then surveyed the public policy considerations against such contracts in divorce cases that are recognized in

decisions throughout the United States. Two basic policy considerations have led courts to invalidate contingency fees in divorce actions: (1) the recognition that these contracts tend to promote divorce and (2) the lack of need for such contracts under modern domestic relations law. As to the tendency to promote divorce, the court quoted the following passage from an earlier Indiana decision:

> "An agreement by a woman to pay her attorney any part of the alimony recovered in a suit against her husband for divorce is against public policy and void. . . . 'Contracts like the one in question tend directly to prevent such reconciliation, and, if legal and valid, tend directly to bring around alienation of husband and wife by offering a strong inducement, amounting to a premium, to induce and advise the dissolution of the marriage ties as a method of obtaining relief from real or fancied grievances which otherwise would pass unnoticed.' " (Citations omitted.)

*Id.* at 586, 247 N.E. 2d at 852-53, *quoting Jordan v. Kittle*, 88 Ind. App. 275, 150 N.E. 817 (1926). The court reasoned further that even if public attitudes toward divorce have changed since these policies were first established, there was good reason to retain the rule in question.

> It may well be that a majority of the general public is no longer concerned with whether divorces are socially desirable or undesirable, or whether contracts that are designed to facilitate or promote the granting of divorces are valid. We are not yet ready to say, however, that it is no longer the public policy of the State of Indiana to discourage divorces and to condemn contracts which discourage reconciliations and provide incentives to attorneys to obtain divorces.

*Barelli*, 144 Ind. App. at 588-89, 247 N.E. 2d at 853.

The second major policy consideration identified by the *Barelli* court is the lack of need for contingent fee arrangements in divorce actions as a financial matter. Indiana, like North Carolina,[2] provides a statutory mechanism whereby a wronged

---

2. G.S. 50-13.6 allows the trial court, in its discretion, to award reasonable attorney's fees to an interested party who has insufficient means to defray the ex-

wife seeking representation in a domestic action may be assured the financial means by which to employ an attorney. The court reasoned that even if it were inclined to hold that public policy was no longer offended by contracts tending to facilitate or promote divorce, there was no compelling reason or necessity to do so in light of the statutory provision regarding attorney's fees.

> No matter how destitute the wife may be, she does not need a contingent fee contract to enable her to employ an attorney. Her ability to employ an attorney is assured by the statute which empowers and requires the court to order the husband to pay both a preliminary fee and a reasonable fee at the time he grants the wife a divorce. Thus there is no necessity, so far as the wife is concerned, for abandoning the rule that a contingent fee contract to pay an attorney a sum equal to a percentage of the alimony or property settlement recovered in a divorce action is contrary to public policy and therefore void. (Footnote omitted.)

*Id.* at 589, 247 N.E. 2d at 853.

One further relevant policy consideration was identified by the *Barelli* court:

> Wives contemplating divorce are often distraught and without experience in negotiating contracts. Should contingent fee contracts between them and the attorneys they employ under such conditions become the usual fee arrangement, charges of overreaching and undue influence will be all too frequent. The public, the legal profession, and the bench would all suffer. We believe all will benefit by maintaining the present public policy of not enforcing such contracts no matter how freely and fairly entered into and how reasonable may be the fee thereby produced. The wise discretion of capable and experienced trial judges (aided by the evidence placed before them by the parties prior to the time the court fixes the fee to be paid by the husband) can be relied upon to assure every attorney an adequate fee and thus assure every wife adequate representation.

---

pense of an action for custody and support of minor children. Similarly, under G.S. 50-16.4 the trial court may allow reasonable counsel fees to a dependent spouse in actions for alimony at any time that spouse would be entitled to alimony pendente lite pursuant to G.S. 50-16.3.

*Id.* at 589, 247 N.E. 2d at 853.

All of the public policy considerations identified and discussed by the court in *Barelli* are implicated, to some degree, in the case under discussion, and are reflective of the public policies of this jurisdiction.

It is well established that a promise or contract looking to the future separation of a husband and wife will not be sustained. *Archbell v. Archbell*, 158 N.C. 409, 74 S.E. 327 (1912); *Matthews v. Matthews*, 2 N.C. App. 143, 162 S.E. 2d 697 (1968). This is so because "the law looks with disfavor upon an agreement which will encourage or bring about a destruction of the home." *Matthews v. Matthews, supra* at 147, 162 S.E. 2d at 699. Hence, such agreements or contracts are held to be void as against public policy and unenforceable in the courts of this state. *See generally* 3 Strong's N.C. Index 3d, Contracts § 6.2 (1976).

We are persuaded by the reasoning and logic of the *Barelli* court that the interests of the citizens of this state would be best served by adoption of the rule that a contract for the payment of a fee to an attorney contingent upon his procuring a divorce for his client or contingent in amount upon the amount of alimony and/or property awarded is void as against public policy. Therefore, the contract sued upon by the intervenor law firm is unenforceable exclusively by virtue of the fact that it violates the public policy of this state.[3]

B

[2] The question remaining to be addressed by this appeal is whether the law firm of Stepp, Groce, Pinales & Cosgrove is entitled to any compensation for the legal services rendered on behalf of Mrs. Thompson prior to the firm's being discharged by her on 16 February 1981. We note here that at least one court has held that an attorney serving under a contingent fee contract in a divorce case may not recover the reasonable value of his services, *Baskerville v. Baskerville*, 246 Minn. 496, 75 N.W. 2d 762 (1956). The *Baskerville* court reasoned as follows:

---

3. Inasmuch as we base our holding on this ground alone, we need not address the question of whether a contingency fee arrangement was financially necessary in order that Mrs. Thompson be able to seek legal redress or whether this particular contract was otherwise fair and reasonable under the circumstances.

. . . [T]he law does not favor divorce and . . . any agreement for divorce, or any collateral bargaining promotive of it, is unlawful and void.

*     *     *

Since the illegality of the contingent fee contract rests on the ground that it may govern a lawyer's action in a manner which thwarts public policy, the taint of illegality permeates the entire lawyer-client relationship in a divorce action so that every objection to permitting a recovery on the express agreement applies with equal force to an attempted recovery in quantum meruit. (Citation omitted.) (Footnote omitted.)

*Id.* at 504, 513, 75 N.W. 2d at 768, 773.

We decline to adopt such a rule in the case under discussion for two reasons. First, although the evidence was conflicting as to when the subject of fees was first discussed, it is undisputed that the contingency fee contract at issue was not executed until 27 January 1981, which was three weeks after the establishment of the attorney-client relationship between the parties. Therefore, the "taint of illegality" did not explicitly permeate that relationship until it was half-way over. Secondly, as this is a case of first impression and the legal status of such contracts had not been conclusively established, we believe that considerations of basic fairness argue in favor of allowing recovery in *quantum meruit* for the reasonable value of the discharged law firm's services as of the date of discharge. *See Covington v. Rhodes, supra* (discharged attorney is entitled to recover reasonable value of services he has already provided); Anno., 92 A.L.R. 3d 690 (1979) (attorney employed on a contingent fee contract discharged without fault on his own part limited to *quantum meruit* recovery).

It is evident from the trial court's findings of fact and conclusions of law that the court considered the size of the fee that the plaintiff attorneys would have received under their contingent fee contract in setting its award of $85,000 as a reasonable attorney fee. Therefore, the judgment must be reversed and the matter remanded to the trial court for a new trial so that the reasonable value of the services provided defendant by the discharged law firm prior to 16 February 1981 may be determined free of the taint of the unenforceable contingency fee agreement.

Reversed and remanded.

Judge HILL concurs.

Judge HEDRICK dissents.

Judge HEDRICK dissenting.

I agree with the majority that the contingency fee contract in question is void and unenforceable. Furthermore, it is my opinion the trial judge abused his discretion in entering the order allowing the attorneys to intervene in their ex-client's domestic lawsuit against her husband. The majority, in Footnote #1, seems to agree with the court's decision, citing a "pre-Rules" case as their sole support for affirming the trial court's order allowing the intervention. With respect to the court's exercise of discretion to allow a party to intervene, the pertinent portion of N.C. Gen. Stat. Sec. 1A-1, Rule 24, North Carolina Rules of Civil Procedure, provides: "[T]he court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties." It seems clear to me that the ruling of the trial court allowing this law firm to intervene in this domestic action for the purpose of enforcing a contingency fee contract had the potential to grossly prejudice both of the original parties. In my opinion, the trial court erred in entering the order allowing the intervention, and I vote to vacate the judgment entered pursuant thereto.